IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTONIO LANKO,       )
      )
      Plaintiff,       )       Civil Action No. 2:21-cv-01075
      )
vs.       )
      )
JOHN WETZEL, MALINDA ADAMS,       )
K. FEATHER, and ADAM MAGOON,       )
      )
      Defendants.       )

## MEMORANDUM OPINION[1]

Plaintiff, Antonio Lanko ("Lanko") commenced this civil action, proceeding *pro se*, against defendants John Wetzel, Malinda Adams, Karen Feather, and Adam Magoon ("Defendants"). He claims that by exposing him to COVID-19 at the State Correctional Institution at Mercer ("SCI-Mercer") where he was incarcerated, Defendants violated his civil rights under 42 U.S.C. § 1983.

Pending before the Court is Defendants' Motion for Summary Judgment (ECF No. 80). For the reasons discussed herein, Defendants' Motion for Summary Judgment will be granted.

I.     **Relevant Procedural History**

Lanko filed his initial Complaint on September 9, 2021 (ECF No. 7) against multiple defendants. He later filed an Amended Complaint (ECF No. 14) and a Second Amended Complaint (ECF No. 21), the latter of which is the operative pleading. The Second Amended

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case as authorized by 28 U.S.C. § 636 (ECF Nos. 9, 21). Thus, the undersigned has the authority to decide dispositive motions and enter final judgment.

Complaint names as defendants Adam Magoon, a corrections officer at SCI-Mercer, Karen Feather, the Corrections Healthcare Administrator at SCI-Mercer, John Wetzel, the former Secretary of the Department of Corrections (DOC), and Malinda Adams, the SCI-Mercer Superintendent.  Lanko asserts that the Defendants "neglected safety protocols, and precautions set as preventative measures to contracting COVID-19."  ECF No. 21, p. 4.

After the close of discovery, Defendants moved for summary judgment (ECF No. 80), and filed a Brief in Support (ECF No. 84), a Concise Statement of Material Facts (ECF No. 83), and an Appendix of Exhibits (ECF No. 82).  Lanko filed a Response to the Motion for Summary Judgment (ECF No. 89), along with Undisputed Material Facts (ECF No. 90), a Response in Opposition to Defendants' Concise Statement of Material Facts (ECF Nos. 91, 93), and a Brief in Support of his response which includes 12 exhibits (ECF No. 92).  Finally, Defendants filed a Response to Lanko's Statement of Facts (ECF No. 94) and a Reply to Lanko's Response to Motion (ECF No. 95).  Thus, the motion has been fully briefed.

## II.    Relevant Factual Background[2]

### A.   COVID-19 protocols and conditions at SCI-Mercer

Lanko alleges that because COVID protocols for safety were not followed at SCI-Mercer,

---

[2] The following facts are undisputed unless otherwise noted. They are based on Defendants' Concise Statement of Undisputed Material Facts (ECF No. 83) and Lanko's Response to Defendants' Concise Statement of Undisputed Material Facts (ECF No. 93).  In determining whether genuine issues of material fact exist, the Court will consider the factual assertions Lanko has made to the extent that they are based on his personal knowledge, set out facts that would be admissible in evidence, and state competent testimony on the matters at issue.  *See* Fed. R. Civ. P. 56(c)(4).  The Court notes that Lanko's Response to Defendants' Concise Statement of Undisputed Material Facts is misnumbered beginning at No. 21.  The Court attributed Lanko's responses to each of Defendants' facts where it determined it was appropriate.

his health and life were placed in danger. Lanko states that some employees at SCI-Mercer adhered to the protocols but others refused to wear masks, only occasionally wore masks, wore damaged or defective masks, or wore masks inappropriately. ECF No. 93, ¶ 10. Various declarations from other inmates submitted by Lanko state that Superintendent Adams did not wear a mask.

This issue is disputed. In her declaration, Adams states, "During the time period when the indoor mask mandate was in effect, when doing rounds on the units or interacting with officers and/or inmates, I would always wear my mask." ECF No. 82-2, ¶ 23. Officer Magoon asserts that "I would always wear [my mask] when doing my rounds, interacting with other officers and inmates." ECF No. 82-6, ¶ 4.

In addition, Lanko claims prisoners were given diluted cleaning solutions and were not provided the opportunity to clean. ECF No. 21, pp. 13-14, ¶ 21, p. 40, ¶ 14. In response to these assertions Magoon states, "We were regularly issued cleaning chemicals from the maintenance department. The chemicals came in pouches and were poured into a 5 gallon chemical container, diluted with water, and separated into spray bottles, and handed out to the block workers." ECF No. 82-6, ¶ 18. "The cleaning chemicals were diluted the same way during COVID as they were pre-COVID. From time to time, we would pass the spray bottles, through the feeding apertures, to inmates to clean their cells." *Id.* ¶¶ 19-20. The parties differ on whether this conduct was appropriate under pandemic protocol.

As part of his civil rights claims, Lanko highlights the fact that inmates at SCI-Mercer were not regularly tested for COVID-19. ECF No. 21, pp. 20-22. Defendant Feather's Declaration (ECF No. 82-5) acknowledges that mass testing did not occur and that the authority to do so would

have to come from the DOC's Central Office.  ECF No. 82-5, ¶ 8.  The prison only tested inmates who were moving in and out of the prison for various reasons.  *Id*. ¶ 6.

Lanko also claims that former Secretary Wetzel knew that Superintendent Adams was violating safety protocols.  In support of this claim, Lanko submitted the declarations of four inmates.  ECF 92-5.  Their allegations about Wetzel appear to be based upon claims made in another lawsuit on related issues.  Notably, the declarations fail to present any admissible evidence to support Lanko's claim that Wetzel was aware of any wrongful conduct at SCI-Mercer during the relevant time period.  In addition, Lanko asserts that he and three other inmates directed letters to Wetzel informing him of lax adherence to COVID-19 rules at SCI-Mercer.  ECF No. 92-4.  He asserts that this represents proof that Wetzel was aware of COVID protocol problems at the prison.  ECF No. 93, ¶ 50.  However, as it relates to Lanko, Defendants have submitted evidence from the correspondence log of the Secretary of Corrections that Wetzel did not receive any letters from Lanko at any time.  ECF No. 83, ¶ 47; ECF No. 82-7 (Declaration of Dawn Christiana, Executive Secretary in the Deputy Secretary's Office). None of the other inmates declare that their letters were, in fact, sent to the Secretary.[3]

According to Lanko, staff members would come to work despite testing positive for COVID-19.  ECF No. 21, p. 28, ¶ 56.  Specifically, he asserts that Officer Magoon "came to work on November 3rd, and November 22nd of 2020, knowing that he was positive for COVID-19."  ECF

---

[3] The inmates' declarations on this topic are identical and state: "The letters written to [Mr. Wetzel] wasn't [sic] transcribed or addressed, and the evidence of that is in the defendants own Exhibit 7.  The transcription of correspondences stops at 2019 June 6th.  These letters were written and sent in 2020, during a countrywide quarantine."  ECF No. 92-5, p. 3.  However, the tracking information regarding the lack of any correspondence from Lanko that is supplied in Exhibit 7 by Ms. Christiana is dated December 2, 2021, well after the date in 2020 that he alleges his letter were sent.

No. 92-3, p. 7.  According to the sworn statement of a fellow inmate, Alonzo Davis, "[O]fficer Magoon comes [sic] to work on [t]wo separate occasions, positive with covid-19.  He told me he was positive out of his own mouth.  Both Times!"  ECF No. 92-3, p. 4.  In his statement, inmate Joshua Scheller states, "Former 2-10 regular officer on HB[lock] Mr. Magoon admitted to the whole block that he was positive for Covid-19.  He even bragged about having it twice.  Talked about how [he] shouldn't even be at work.  Sometimes he wouldn't even wear his mask."  *Id.* at 6. According to inmate Shawn Conley, "[Adam Magoon] confessed the [sic] he informed the administration of his [positive COVID-19] medical status, and they encouraged him to come [to work] anyway."  ECF No. 92-5, p. 24, ¶ 12.

By contrast, Magoon states that he only experienced symptoms of COVID-19 on November 22, 2020, took a COVID detection test, tested positive, and did not report to work that day.  *Id.* ¶¶ 10-12.  According to Officer Magoon, "November 22, 2020, was the only time I ever tested positive for COVID.  I did not tell inmates on HB[lock] I was sick or that I had a positive COVID test because I was not at work when I had COVID."  *Id.* ¶¶ 14-15.  Officer Magoon further represents that "I was never told to come to work when I was sick, and I never told any of the inmates that I was instructed to come to work while ill."  ECF No. 82-6, ¶ 17.

Lanko claims he became ill with COVID-like symptoms in November 2020, after Magoon told the prisoners he was COVID positive.  Lanko states that he tried to submit a sick call slip, but they were being refused by the nursing staff.  ECF No. 93, p.7, ¶¶ 27, 28, 32.  He was never tested for COVID and claims to have been denied critical medical treatment.  ECF No. 92, pp. 12-13. Similarly, inmate Conley states that he and other inmates on the block all had COVID symptoms. When he tried to give a sick call note to the nurse who was making rounds she responded, "They're

not going to do anything about this.  Unfortunately, Mr. Conley, everyone is sick, and theirs [sic] nothing we can do for you but give you pain medication, to ease your pain.  If you don't need a ventilater [sic], theirs [sic] nothing we can do, other than quarantine you and give you pain meds."  ECF No. 92-2, p. 2.  Conley further states, "No test ever came to me, or even the majority of our block, nothing went any further."  *Id*. at 3.

Lanko never tested positive for COVID.  ECF No. 83, ¶ 26; 82-5, ¶ 4.  Moreover, according to Defendant Feather, "there was never any direction put out to not take sick-call slips."  ECF No. 82-5, ¶ 9.  As she notes, "I do not have the authority to conduct mass testing.  This direction would need to come from Central Office."  ECF No. 82-5, ¶ 8.  Further, while Lanko claims that a thermometer used to check inmate temperatures was faulty, Feather was unaware of a malfunctioning thermometer but if notified she would have directed medical staff to immediately replace it.  ECF No. 82-5, ¶ 10; ECF No. 82-2, ¶ 22.

Defendants assert that with respect to matters related to the COVID-19 pandemic, SCI-Mercer at all times has consistently adhered to the guidance of the Center for Disease Control ("CDC") specific to correctional and detention facilities, the Pennsylvania Department of Health, and its own medical team to ensure the safety of inmates and staff within the facility.  ECF No. 83, ¶ 10.

    B.  <u>Availability of Grievance Process at SCI-Mercer</u>

The availability of the prison grievance process during the COVID pandemic is at issue.  It is undisputed that on March 16, 2020, Superintendent Adams instructed staff to remove the grievance boxes from the units and directed staff to add a "Grievance" label to the existing mailboxes to alleviate the burden of collecting the grievances.  ECF No. 82-2, ¶ 4.  A dedicated

box for grievances remained available in the cafeteria.  Adams states that the inmates were notified of the change and the change was advertised on the walls of the housing units.  *Id.* ¶¶ 6-7.  In addition, inmates had the option of handing grievances directly to Adams' assistant, Nicole Franz, each week.  *Id.* ¶ 8.  Because it was determined by the Department of Corrections that as of October 21, 2020, dining halls were not going to reopen, the grievance boxes were placed back on the housing units."  *Id.* ¶ 9.

Lanko disputes that during the relevant time period, there was grievance box on the block or that the word "Grievance" was put on the mailbox.  ECF No. 93, ¶ 1.  Further, he claims, there were no advertisements of a change in the grievance deposit system.  *Id.*  While Ms. Franz would come to the unit and sign the logbook, she would not announce her presence or make rounds and would leave without the inmates knowing she was there.  *Id.* ¶¶ 2, 5, 8.  According to Lanko, "[T]he Grievance box was removed, we were locked in our cells for 23 plus hours a day, we had no access to file grievances, because we had no where [sic] to submit them, no notice, sign, memo or announcement, existed at this time."  ECF No. 93, ¶ 2, p. 3.  According to Inmate Scheller, "The mailbox at the time didn't have grievance written on them [sic], just mailbox.  To put a grievances [sic] in a mailbox would have resulted to [sic] the grievances being returned."  ECF No. 92-5, ¶¶ 17-18.  Notably, however, while Scheller and inmates Conley, Robinson, and Ortiz all attest to the unavailability of the grievance system at SCI-Mercer, they either assert that this occurred in April 2020, or do not identify a timeframe during which this is said to have occurred.  ECF No. 92-1. On the other hand, November 2020 is universally identified as the time frame in which the declarants, who were housed in H-Block, experienced COVID symptoms.  ECF No. 92, Appxs. A and E.

In addition to asserting that the grievance system was available to Lanko and other inmates at all times, Defendants note that grievance boxes were returned to all housing units in October 2020.  Indeed, Lanko testified that he was able to submit grievances in November and December 2020.  ECF No. 82-1.

> Q:  You mentioned that you also filed grievances.
> A:  Yes….
> Q:  Tell me about that.  How did you file the grievances?
> A:  We could not file them.  I wrote it but it's not going anywhere….
> Q:  So, did you or did you not send in grievances in November and December of 2020?
> A:  I did send them, I could, and yes, I wrote them, yes.  I did submit them.
> Q:  Do you have copies of these grievances that you wrote?
> A:  Yes, I do.

*Id*. at 3-4.

## III.     Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of showing the absence of a genuine, material dispute and an entitlement to judgment.  *See id.* at 323.  This showing does not necessarily require the moving party to disprove the opponent's claims.  Instead, this burden may often be discharged simply by pointing out for the court an

absence of evidence in support of the non-moving party's claims.  *See id.*; *see, e.g.*, *Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015).

Once the moving party has met its initial burden, then the burden shifts to the non-moving party to demonstrate, by affidavit or other evidence, "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A non-moving party must "go beyond the pleadings" and show probative evidence creating a triable controversy.  *Celotex*, 477 U.S. at 324.  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor.  *See Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cnty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

Although courts must hold *pro se* pleadings to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), at the summary judgment stage a *pro se* plaintiff is not exempt from his burden of providing some affirmative evidence, not just mere allegations, to show that there is a genuine dispute for trial. *See, e.g.*, *Barnett v. NJ Transit Corp.*, 573 F. App'x 239, 243 (3d Cir. 2014) (holding that the *pro se* plaintiff was still "required to designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories…sufficient to convince a reasonable fact finder to find all the elements of her prima facie case") (citation and quotation omitted); *Siluk v. Beard*, 395 F. App'x 817, 820

(3d Cir. 2010) ("[T]he right of self-representation does not exempt a party from compliance with relevant rules of procedural law."); *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (*pro se* plaintiffs "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.")

## IV.   Discussion

Lanko brings his claims under 42 U.S.C. § 1983.  He asserts that his civil rights under the Eighth and Fourteenth Amendments were violated when Defendants' actions exposed him to COVID-19.  He claims that Adams, Feather, and Magoon neglected safety protocols and preventive measures that should have been implemented to protect inmates from contracting COVID-19.  In addition, Lanko asserts that Wetzel was complicit in the non-compliant behaviors of SCI-Mercer employees.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 does not create substantive rights but instead "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

"The first step in evaluating a section 1983 claim is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional right at all."  *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (internal quotations and citations omitted). "Next, a plaintiff must demonstrate a defendant's 'personal involvement in the alleged wrongs.'" *Id.* (quoting *Rode v.*

10

*Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).  That is because only a person who subjects, or causes to be subjected, another person to a civil rights violation can be held liable under § 1983.

In Defendants' Motion for Summary Judgment, they argue that  (1) Lanko failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), and (2)  even if Lanko had exhausted his administrative remedies, he failed to proffer any evidence that supports his claim that Defendants acted with deliberate indifference.

In turn, Lanko asserts that the grievance system was unavailable to him.  Further, he contends that his constitutional claims are supported by sufficient evidence of record.

A.  Exhaustion of Administrative Remedies

The PLRA mandates that an inmate exhaust "such administrative remedies as are available" before bringing a suit challenging prison conditions.  42 U.S.C. § 1997e(a).  The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  The Supreme Court has repeatedly observed that the PLRA's exhaustion requirement "is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 578 U.S. 632, 638 (2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) and *Jones v. Bock*, 549 U.S. 199, 211 (2007)).  Exhaustion is mandatory under the PLRA regardless of the type of relief sought and the type of relief available through administrative procedures.  *See Booth v. Churner*, 532 U.S. 731, 741 (2001).  A failure to exhaust administrative remedies in accordance with a prison's grievance procedures constitutes procedural default.  That is so because "the PLRA's exhaustion requirement requires proper exhaustion."

11

*Woodford*, 548 U.S. at 93-95; *see also Spruill v. Gillis*, 372 F.3d 218, 227-30 (3d Cir. 2004).

Failure to exhaust is an affirmative defense under the PLRA.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007).  A defendant has the burden of proving that plaintiff failed to exhaust his available administrative remedies.  *See, e.g.*, *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018).  If the defendant demonstrates that the inmate failed to exhaust his administrative remedies, then "the inmate plaintiff bears the onus of producing evidence that the on-the-books remedies were in fact unavailable to him or her."  *West v. Emig*, 787 F. App'x 812, 814 (3d Cir. 2019) (citing *Rinaldi*, 904 F.3d at 268).  "If there is no genuine dispute of material fact, then the exhaustion defense may be evaluated as a matter of law at summary judgment."  *Id.*

The Supreme Court explained in *Ross* that the term "available" means "capable of use" to obtain "some relief for the action complained of."  578 U.S. at 642-43 (quoting *Booth*, 532 U.S. at 738).  The Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books," is not "available" because it is "not capable of use to obtain relief": (1) when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use," such as when no ordinary prisoner can discern or navigate it; or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Rinaldi*, 904 F.3d at 266-67 (quoting *Ross*, 578 U.S. at 644).  *See also Hardy v. Shaikh*, 959 F.3d 578, 584 (3d Cir. 2020) (misleading or deceptive instructions from a prison official, as well as clearly erroneous statements, can render a grievance process unavailable).  Absent a situation where administrative remedies are not "available," a court may not excuse an inmate's failure to exhaust "irrespective of any 'special circumstances.'"  *Ross*,

578 U.S. at 639.

Importantly, the prison's grievance policy is what "define[s] the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218; *Spruill*, 372 F.3d at 231 ("prison grievance procedures supply the yardstick for measuring procedural default."). Thus, the procedural requirements for exhaustion in a given case are drawn from the policies of the prison in question rather than from any free-standing federal law.

It is uncontested that the grievance box was removed from Lanko's housing unit on March 16, 2020.  ECF No. 82-2, ¶ 4.  According to Adams, after the grievance boxes were removed signs were placed on the walls of the housing units explaining that inmates could use the U.S. postal mailboxes to deposit grievances and the inmates were notified of the same.  *Id*. ¶¶ 6-7.  In the alternative, inmates could hand grievances directly to Adams' assistant, Nicole Franz during her weekly rounds, or they could deposit grievances in a grievance-only box in the cafeteria.  *Id*. ¶¶ 7-8.

Although the timing of the changes in the grievance procedures coincided with the onset of the COVID-19 pandemic, Adams states the modification was in no way related to COVID, but to reduce employee burden.  *Id*. ¶¶ 4-5.  At some point, however, because of COVID safety measures, the prison cafeteria was closed, and the inmates were required to eat in their cells, thus eliminating access to the one solely grievance-designated box in the prison.  On October 21, 2020, the prison was notified that the cafeteria would not reopen, and Adams directed that the grievance boxes be placed back in the housing units.  *Id*. ¶ 9.  Lanko's cell block HB Unit was placed on enhanced quarantine from November 17, 2020, through December 19, 2020.  *Id*. ¶ 18.  Franz attests that even during "enhanced quarantine, inmates could still file grievances by placing them

in the grievance box on the way to the showers, handing them to any officer working on the unit, or handing them to me."  ECF No. 82-3, ¶ 12.

There is no evidence of record that Lanko filed a grievance regarding his claims in this case.  Rather, he argues that the grievance system was unavailable to him because the changes that Adams put into effect were not explained to the prisoners and the usual grievance deposit boxes were inaccessible.

Thus, it must be determined if the grievance process was available to Lanko with respect to his claims against each of the defendants.

1.  Defendant Magoon

Lanko alleges that Magoon contracted COVID-19 in the month of November 2020, came to work despite knowing that he had COVID, and failed to wear a mask.  Lanko asserts that he later became ill with COVID-like symptoms.  There is no evidence in the record that Lanko grieved Magoon's conduct.  Thus, he failed to exhaust his administrative remedies, and would only be able to pursue a claim against Magoon if the grievance process was unavailable in November 2020.

Defendants satisfied their burden stating that the grievance system was available to Lanko at all times including during the time he claims he was exposed to and contracted COVID-19. Defendants state that the grievances boxes were returned to the housing units on October 21, 2020, before Lanko says he was infected with COVID in November of 2020.  Thus, Lanko was capable of exhausting his claims.  The burden then shifts to Lanko to demonstrate that the system was actually unavailable to him.  He did not meet this burden.  During his deposition, Lanko admitted that he was able to submit grievances in November and December 2020. Thus, Lanko's claim that the grievance system was unavailable to him in November 2020 is refuted by his sworn testimony.

ECF No. 82-1, pp. 3-4.

Thus, because Lanko failed to exhaust his administrative remedies regarding his civil rights claim against Magoon, Magoon is entitled to judgment in his favor and dismissal of Lanko's claims against him.

### 2. Defendants Wetzel, Adams and Feather

With respect to the remaining defendants, there are disputed issues of fact regarding the availability of the grievance system between April 2020 and November 2020. As a result, Defendants' motion for summary judgment related to administrative exhaustion must be denied with respect to Defendants Wetzel, Adams, and Feather as their allegedly wrongful conduct arose during this time period.

Thus, the Court will proceed to analyze the merits of Lanko's claims against Wetzel, Adams, and Feather. *See Kanu v. Lindsey*, 739 F. App'x 111, 114-16, n.3, n.7 (3d Cir. 2018).

### B. Constitutional Claims against Defendants Wetzel, Adams, and Feather

Lanko asserts that his Eighth and Fourteenth Amendment rights were violated by Defendants' failure to follow proper COVID safety measures.

Two requirements must be met to establish a violation of the Eighth Amendment. First, the deprivation of rights must be objectively "sufficiently serious," and second, a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). "To state a viable failure-to-protect claim, the plaintiff must establish that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was deliberately indifferent to that substantial risk; and (3) the defendant's deliberate indifference caused the plaintiff to suffer harm." *Bistrian*

*v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012), *abrogated on other grounds by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020); *Farmer,* 511 U.S. at 834.

The first element sets out an objective inquiry: that the official "knowingly and unreasonably disregarded an objectively intolerable risk of harm." *Id.* at 132. The second element, "deliberate indifference," is a subjective standard: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001). That is because "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. The plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842.

Because the element of deliberate indifference is subjective, it "can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." *Pearson v. Prison Health Servs.*, 850 F.3d 528, 535 (3d Cir. 2017). Because a defendant's state of mind, like other facts, can be proved by circumstantial evidence, the *Farmer* standard does not require a defendant admit his consciousness of the risk of serious harm before liability can be imposed. But even gross errors of judgment are not constitutional violations; liability requires subjective, not objective, culpability. *See Farmer*, 511 U.S. at 843 n.8. As the Court of Appeals for the Third Circuit has explained:

> "Deliberate indifference," therefore, requires "obduracy and wantonness,"
> *Whitley v. Albers*, 475 U.S. 312, 319 (1986), which has been likened to
> conduct that includes recklessness or a conscious disregard of a serious risk.
> *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (stating that "it is enough
> that the official acted or failed to act despite his knowledge of a substantial
> risk of serious harm").

*Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (parallel citations omitted).

Defendants argue that Lanko cannot establish the subjective prong for an Eighth Amendment claim because there is no evidence that Defendants consciously ignored the threat posed by the COVID-19 virus. ECF No. 84, p. 7. Defendants highlight the measures taken during the COVID-19 pandemic to protect the prisoners from the spread of the virus. "[I]mmediately after the first positive case at SCI-Mercer was reported, that entire unit was placed on enhanced quarantine. SCI-Mercer was also the first prison to conduct a 72 hour institution wide lockdown, deep clean, with other facilities quickly adopting the same approach." ECF No. 84, p. 7. Defendants assert that the DOC as a whole implemented an aggressive approach to the pandemic:

> Requiring that all staff and inmates wear masks; screening all incoming and
> outgoing inmates; subjecting all staff members to enhanced screening upon
> entering the facilities; mandating that inmates showing symptoms of COVID-19
> virus will be isolated and staff with symptoms will be sent home; limiting inmate
> movements and mandating 16 and then 8-man cohorts; and restricting visitation
> with family and friends to virtual methods. Additionally, PPE was provided to all
> staff members, including masks. The COVID vaccine and booster shots have been
> made available to all inmates who wish to accept them.

ECF No. 84, p. 8.

Lanko does not dispute that the DOC mandated these precautionary measures. Rather, he claims that these measures were not implemented or alternatively, were not adequately maintained or enforced at SCI-Mercer. Notably, however, numerous district courts have held that "where a detention facility has taken concrete steps toward mitigating the medical effects of COVID-19, an

17

incarcerated person will fall 'well short' of establishing that the facility and its staff were deliberately indifferent toward his medical needs in light of the virus even though they cannot entirely 'eliminate all risk' of contracting COVID-19, notwithstanding even serious preexisting medical conditions the prisoner may have." *Pumba v. Kowal*, 2022 WL 2805520, at *4 (E.D. Pa. July 18, 2022) (quoting *Hope v. Warden York County Prison*, 972 F.3d310, 330-331 (3d Cir. 2020)). In that case, the court rejected a claim based on a sergeant permitting a pod worker who tested positive to clean the plaintiff's cell without wearing a mask and presumably exposing him to COVID-19.  The court further noted that the plaintiff alleged that the sergeant acted negligently, resulting in the spread of the virus, but "a claim based on mere negligence is insufficient to allege a plausible Eighth Amendment violation." *Id.* at *5. *See also Greene v. Ellis*, 2022 WL 4288279, at *3 (D.N.J. Sept. 16, 2022) (prisoner alleged that jail did not provide adequate social distancing and that there was not a mask exchange program, but this was insufficient); *Chapolini v. City of Philadelphia*, 2022 WL 815444, at *15 (E.D. Pa. Mar. 17, 2022) (allegations that prisoner was housed with multiple cellmates who did not go through proper quarantine insufficient).

Thus, even accepting as true Plaintiff's allegations that conditions at SCI-Mercer were not completely compliant with guidance of the Center for Disease Control ("CDC") specific to correctional and detention facilities, as well as the Pennsylvania Department of Health, and its own medical team, these allegations do not support a claim of deliberate indifference. As Judge Lenihan observed in a similar case: "Simply because the execution of COVID-19 protocols may have been nonoptimal at times, the alleged deficiencies fall well short of evidencing deliberate indifference by the named Defendants." *Jones v. County of Allegheny*, 2022 WL 2806779, at *6 (W.D. Pa. June 24, 2022). *See also Easley v. Wetzel*, 2021 WL 1200214, at *6 (W.D. Pa. Feb. 26, 2021)

18

(Lanzillo, M.J.), *report and recommendation adopted*, 2021 WL 1197483 (W.D. Pa. Mar. 30, 2021).

To proceed with a claim against a defendant, a plaintiff must establish a defendant's personal involvement in the alleged deprivation of his constitutional right.  *See, e.g.*, *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).  That is because, as stated in the text of Section 1983 itself, only a person who "subjects, or causes to be subjected" another person to a civil rights violation can be held liable under Section 1983. Thus, each defendant is liable only for his or her own conduct.  *See, e.g.*, *id*.; *see also Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016); *Barkes v. First Correctional Medical*, 766 F.3d 307, 316 (3d Cir. 2014) (rev'd sub. nom. on other grounds 575 U.S. 822 (2015)); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005) ("To impose liability on the individual defendants, Plaintiffs must show that each one individually participated in the alleged constitutional violation or approved of it.") (citing *C.H. v. Oliva*, 226 F.3d 198, 201-02 (3d Cir. 2000) (en banc)).

Lanko's claim against Wetzel fails because there is no evidence that Secretary Wetzel was personally involved with any lax implementation or enforcement of COVID rules at SCI-Mercer. There is no evidence that Wetzel received the letters that Lanko claims were sent to him or that Wetzel otherwise knew if or how the DOC protocols regarding COVID were being handled at SCI-Mercer.[4]  Thus, Lanko has failed to establish any personal involvement by Wetzel in the alleged constitutional violations.

---

[4] All of  the inmates' declarations (ECF No. 92-5) cite to video footage from another lawsuit, *Brown v. Wetzel,* which they say proves that Wetzel knew that Adams and others weren't following COVID safety protocols.  However, that footage is not part of the record in this case and therefore cannot be considered.

Lanko's claims against Adams include that she allegedly did not wear a mask around prisoners; however, even if assumed to be true, he does not attribute Adam's behavior to his own alleged contraction of COVID-19.  Moreover, as there is no evidence that Adams had COVID-19 during the relevant time period,  he cannot assert that she purposely and deliberately exposed him to COVID by not wearing a mask.  Further, it is undisputed that as superintendent of SCI-Mercer, Adams implemented a number of reasonable measures to address COVID.  There is no evidence that she knew of an excessive risk of inmate health and deliberately disregarded that risk.  As noted by the Third Circuit: "In light of these measures and the unprecedented and evolving nature of the pandemic, [plaintiff] does not have a plausible claim that prison officials disregarded an excessive risk of harm."  *Mincy v. Governor of Pennsylvania*, No. 21-3263, 2022 WL 4115485, at *2 (3d Cir. Sept. 9, 2022).

Lanko also claims that Feather is liable because all inmates who experienced possible COVID symptoms were not tested.  However, the mere fact that they were not tested fails to show that Defendants "knowingly and unreasonably disregarded an objectively intolerable risk of harm," *Beers-Capitol*, 256 F.3d at 132, or that Feather actually knew or were aware of the excessive risk to Lanko's safety.  *See id*. at 125.  As noted in Feather's Declaration, she did not have the authority to implement mass testing; that would have to come from the DOC. Indeed, inmate Conley's declaration states that healthcare was providing all the medical attention they could for a presumed COVID case.  Thus, there is no evidence that Feather was deliberately indifferent by not COVID testing symptomatic prisoners in H Block.  Furthermore, the other assertions about refusal to accept sick call slips or faulty thermometers do not implicate Feather personally nor is there any evidence of record to support a claim of supervisory liability.

Thus, Wetzel, Adams and Feather are entitled to judgment in their favor with respect to Lanko's Eighth Amendment claim.

Neither Defendants' motion for Summary Judgment nor Lanko's response address Lanko's Fourteenth Amendment claim.[5]  Indeed, it is unclear if the Second Amended Complaint attempts to state a Fourteenth Amendment claim.  At any rate, any due process claim Lanko may have attempted to assert under the Fourteenth Amendment fails. To the extent that he relies upon the absence of a prison grievance system or a failure to follow DOC policies, this does not create a constitutional right.  "Allegations that the DOC failed to follow its regulations or internal policies cannot support a claim based upon a vested right or duty because these administrative rules and regulations, unlike statutory provisions, generally do not create rights in prison inmates."  *Rokita v. Pennsylvania Dep't of Corr.*, 247 A.3d 1192 (Pa. Commw. Ct. 2021).  "If there is no protected liberty or property interest, it is unnecessary to analyze what procedures were followed when an alleged deprivation of an interest occurred."  *Evans v. Fanelli*, No. 1:CV-12-2385, 2013 WL 3049112, at *4 (M.D. Pa. June 17, 2013).  *See also Bronson v. Cent. Off. Rev. Comm.*, 554 Pa. 317, 721 A.2d 357, 358–59 (1998) ("the procedures for pursuing inmate grievances. . . are a matter of internal prison administration").  In the absence of any protected right, no Fourteenth Amendment due process claim exists.

---

[5] The Court may, *sua sponte*, consider Lanko's Fourteenth Amendment claim against Defendants pursuant to the screening provisions of the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996). *See, e.g.*, *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109 n.11 (3d Cir. 2022) (the PLRA's screening provisions at 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c) are "applicable throughout the entire litigation process.") (internal quotation and citation omitted). The Court will evaluate the Fourteenth Amendment claim against Defendants because it is in the interests of judicial economy to resolve the matter at this juncture.

If Lanko has attempted to assert an equal protection claim, it similarly fails.   He acknowledges that all prisoners of H Block and the other housing units were subject to the same protocols and conduct as it relates to COVID issues. Simply put, his claim is based upon prison conditions, not equal treatment of persons of a protected class or a class of one.

C.  State Law Claims

Lanko also asserts state law claims of gross negligence and emotional distress against Defendants.  Where, as is the case here, all claims over which the Court has original jurisdiction are dismissed, a district court may decline to exercise supplemental jurisdiction over any remaining state law claims.  28 U.S.C. § 1367(c)(3).  As the Court of Appeals has held, absent extraordinary circumstances, pendent jurisdiction should be declined when the federal claims are no longer viable.  *See Shaffer v. Bd. of Sch. Dir. Albert Gallatin Area Sch. Dist*., 730 F.2d 910, 912 (3d Cir. 1984) (citations omitted).

Here, Lanko's federal claims are no longer viable, and no extraordinary circumstances exist that would warrant the exercise of supplemental jurisdiction over Lanko's state-law claims. Accordingly, Lanko's state law claims will be dismissed without prejudice.  *See, e.g.*, *Spencer v. Bush*, 543 F. App'x 209, 213 (3d Cir. 2013), *Camacho v. Beers*, No. 16-cv-1644, 2018 WL 6618410, at *3 (W.D. Pa. Dec. 18, 2018).

**V.    Conclusion**

For the reasons set forth herein, Defendants' Motion for Summary Judgment (ECF No. 80) will be granted.

Appropriate orders will follow.

BY THE COURT:


Dated: March 1, 2023                    /s/ Patricia L. Dodge
                                        PATRICIA L. DODGE
                                        United States Magistrate Judge